Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York                                          1:20-cv-00979

| | |
|---|---|
| Janet Kyszenia, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| The Hain Celestial Group, Inc., | |
| Defendant | |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.  The Hain Celestial Group, Inc. ("defendant") manufactures, distributes, markets, labels and sells rice drink beverages purporting to be flavored only with vanilla under their Rice Dream brand ("Products").

2.  The Products are available to consumers from retail and online stores of third-parties and Amazon.com and are sold in cartons of 32 OZ (946 ML).

3.  The relevant front representations include "Vanilla," "Classic," "99% Fat Free,"

"Rice Dream," "Rice Drink" and "Easy to Digest."



4.      The Product's opposite panel contains the Nutrition Facts and ingredient list.

INGREDIENTS: FILTERED WATER, BROWN RICE (PARTIALLY MILLED), EXPELLER PRESSED CANOLA OIL AND/OR SAFFLOWER OIL AND/OR SUNFLOWER OIL, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT.

5.      The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.

I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

6.    Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

7.    Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

8.    Three of the most popular milk alternatives are made from rice, soybeans and almonds.

9.    Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts while 1.5 million are allergic to soy.[2]

10.   Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers have preferences for one over the other and seldom switch between their "plant milk" of choice.

11.   Unlike soy and almond milk, rice milk is valued in part because it is the least allergenic of non-dairy milks.

12.   This makes it popular and widely used because it will be tolerated by more people than soy or almond milk.

13.   A rice milk flavored with vanilla or chocolate will contain different types and amounts of vanilla flavorings than a soy or almond milk, due to its naturally sweeter flavor.

II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

14.   The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[2] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

extractable from one-unit weight of vanilla beans."[3]

15.   Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[4]

16.   Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[5]

17.   It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[6]

18.   This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

19.   Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[7]

20.   Though "food fraud" has no agreed-upon definition, its typologies encompass an

---

[3] 21 C.F.R. §169.3(c).
[4] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[5] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.
[6] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.
[7] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

### A. Food Fraud as Applied to Vanilla

21.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[8]

22.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[9]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[10]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better |

---

[8] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[9] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

[10] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

|  | resemble the hue of rich, yellow butter |
|---|---|
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[11]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[12]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |

---

[11] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[12] Berenstein, 423.

➤ Ingredient List Deception[13]

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  - o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described
  - o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
  - o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor
  - o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

23.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

> the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

> *The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[14]

B.    The Use of Vanillin to Simulate Vanilla

24.    The most persistent challenger to the authenticity of real vanilla has been synthetic

---

[13] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

[14] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

versions of its main flavor component, vanillin.

25.     First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

26.     According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[15]

27.     Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

28.     Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

29.     Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

30.     This means that if a product is represented as being characterized by vanilla yet contains non-vanilla vanillin, the label and packaging must declare vanillin an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'."); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (Vanilla-vanillin flavoring and Vanilla-vanillin powder).

---

[15] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

31.     This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C.   Production of "Natural Vanillins" Combined with "Natural Vanilla"

32.     The past ten years have seen many vanillins purporting to be a "natural flavor" – derived from a natural source material which undergoes a natural production process.

33.     However, "natural vanillin" is not a "natural vanilla flavor" because the raw material is not vanilla beans but ferulic acid and eugenol.

34.     Ferulic acid can be converted to vanillin through a natural fermentation process which is cost prohibitive for almost all applications.

35.     Vanillin from eugenol is easier to produce in a way claimed to be a "natural process."

36.     However, because this process occurs without transparency or verification in China, regulators and consumers are not told the production method is more properly described as that of an artificial flavor, involving a chain of chemical reactions.

III.   Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

37.     The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

38.     The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[16]

39.     Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products

---

[16] Amanda Del Buouno, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

contained *only* vanilla.

40.    These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.    Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

41.    The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices.

42.    Contrary to their intention, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla and harvest palm oil under the pretense of "crop diversification."

43.    There have also been allegations that these programs use child and/or slave labor.

44.    Other tactics alleged to be utilized by these companies include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to remaining bidders.[17]

45.    The reasons for these counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

46.    When less vanilla is available, companies must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.    Use of Vanilla WONF Ingredients to Replace and Provide Less Vanilla

47.    Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

48.    According to Suzanne Johnson, vice president or research at a North Carolina

---

[17] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

49.     The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

50.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[18]

51.     These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[19]

52.     The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

C.   Decline of Industry Self-Governance

53.     That high level executives in the flavor industry are willing to boast of their stratagems to give consumers less vanilla for the same or greater price is not unexpected.

54.     The once powerful and respected trade group, The Flavor and Extract Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

55.     FEMA previously opposed industry efforts to deceive consumers, but cast the public to the curb in pursuit of membership dues from its largest members, such as Unilever.

---

[18] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[19] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

IV.     Front Label is Misleading Due to Not Disclosing Non-Vanilla Flavors

56.    Where a food makes any representations as to its primary flavor, it must be designated in a way which gives consumers the required information to make an informed purchasing decision.  *See* 21 C.F.R. § 101.22(i)(1)(i)-(iii) (factors for flavor labeling include the presence of natural and artificial flavor, whether the natural and artificial flavor simulates, resembles or reinforces the characterizing flavor and whether the natural flavor is obtained from the food ingredient represented as the characterizing flavor – i.e., does the peach flavor come from real peaches or is it synthesized from apricots).

57.    The Product's label of "Vanilla" gives the impression that its entire flavor (taste sensation and ingredient imparting same) is contributed by the characterizing food ingredient of vanilla beans.  *See* 21 C.F.R. § 101.22(i)(1) (describing a food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)).

58.    The representations are misleading because though the front label designates the Product as "Vanilla," the ingredient list identifies "Natural Vanilla Flavor With Other Natural Flavors."

<u>Ingredient List</u>

INGREDIENTS: FILTERED WATER, BROWN RICE (PARTIALLY MILLED), EXPELLER PRESSED CANOLA OIL AND/OR SAFFLOWER OIL AND/OR SUNFLOWER OIL, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT.

**INGREDIENTS:** FILTERED WATER, BROWN RICE (PARTIALLY MILLED), EXPELLER PRESSED CANOLA OIL AND/OR SAFFLOWER OIL AND/OR SUNFLOWER OIL, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT.

59.    The term "With Other Natural Flavors" following the name of the characterizing

flavor of vanilla ("Natural Vanilla Flavor") on the ingredient list means these flavors (1) are not derived from vanilla and (2) "simulate[s], resemble[s] or reinforce[s] the characterizing flavor" of vanilla. *See* 21 C.F.R. § 101.22(i)(1)(iii).

60.   21 C.F.R. § 101.22(i)(1)(iii) states:

> If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

61.   If the amount of the characterizing vanilla flavor is sufficient to independently characterize the Product, the front label would state "[Vanilla] With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

62.   If the amount of the characterizing vanilla flavor is insufficient to independently characterize the food, the front label would state "[Vanilla] Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section"; *see also* 21 C.F.R. § 101.22(i)(1)(i).

63.   Moreover, because the standardized vanilla ingredients – vanilla extract and vanilla flavoring "are expensive" and valued by consumers because of their quality, it misleading to not distinguish such flavor combinations from other similar products. Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" when a product contains vanilla with other natural flavors so consumers are not misled as to the amount of vanilla).

64.   If the vanilla WONF used in the Product consists of half vanilla and half non-vanilla

13

natural flavors, the product name should state "contains 50% vanilla extract and 50% non-vanilla flavors" or otherwise disclose the proportions. Exhibit A; 21 C.F.R. § 102.5(b) (requiring disclosure of the "percentage(s) of any characterizing ingredient(s) or component(s) [as part of the product name] when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case.")

65.    To the extent the "Other Natural Flavors" contain vanillin not derived from vanilla, it cannot be designated as "natural flavors" and artificial flavor must be disclosed on the front label.

66.    This is because vanillin has always been considered artificial when used with real vanilla. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

67.    Even if the vanilla WONF does not contain vanillin, the Product's front label still fails to disclose any flavors other than vanilla, which is false and misleading to consumers.

68.    The identification of "Natural Vanilla Flavor With Other Natural Flavors" on the ingredient list is not sufficient to cure the misleading front label designation of "Vanilla" because it fails to tell consumers that the Product contains a de minimis amount of vanilla and that the vanilla taste is supplied by vanillin and/or flavors like maltol and piperonal.

V.    Conclusion

69.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud consumers.

14

70.     Defendant has sold more of the Products and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

71.     The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

72.     The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

73.     Had plaintiff and class members known the truth, they would not have bought the Products or would have paid less for it.

74.     The Product contains other representations which are misleading and deceptive.

75.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $4.59 per unit, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

76.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

77.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

78.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

79.     Plaintiff is a citizen of New York.

80.     Defendant is a Delaware corporation with a principal place of business in New Hyde

15

Park, Nassau County, New York and is a citizen of New York.

81.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

82.    Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

83.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

84.    This is a reasonable assumption because defendant's Products are sold in thousands of stores across all 50 states and have been sold bearing the allegedly misleading claims for at least five years.

85.    "Minimal diversity" exists because even though the parties are citizens of New York, plaintiff seeks to represent persons in all states who purchased the Products. *Gonzales v. Agway Energy Services, LLC*, No. 18-cv-235 (N.D.N.Y. Oct. 22, 2018) ("At this time, the allegation that some class member maintains diversity with Defendant is sufficient to establish minimal diversity under CAFA" and citing 28 U.S.C. § 1332(d)(1)(D) "'the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.").

86.    Certain exceptions preclude diversity jurisdiction. 28 U.S.C. § 1332(d)(4).

87.    The "local controversy" exception does not apply because less than two-thirds of the putative class members are citizens of New York.

88.    Under the "local controversy" exception, a district court must decline jurisdiction if "more than two-thirds of the putative class members are citizens of the state in which the action

was originally filed. *See Green v. Sweetworks Confections, LLC*, No. 18-cv-902 S.D.N.Y. Aug. 21, 2019) quoting 28 U.S.C. § 1332(d)(4)(A).

89.     At bar, the "local controversy" exception is not satisfied because less than two-thirds of proposed class members are citizens of New York.

90.     For more than two-thirds of class members to be citizens of New York, defendant would need two-thirds of its customers to be from New York, even though New York does not contain this percentage of the nation's population.

91.     Under the "home state controversy" exception to CAFA, a district court "shall decline to exercise jurisdiction" if "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B).

92.     For the same reasons that the local controversy exception does not apply, the home state controversy does not apply.

93.     This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

94.     Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

95.     A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

96.     Plaintiff is a citizen of Brooklyn, Kings County, New York.

97.     Defendant The Hain Celestial Group, Inc. is a Delaware corporation with a principal

place of business in New Hyde Park, New York, Nassau County.

98.    During the relevant statutes of limitations, plaintiff purchased the Product within this district and/or State for personal consumption in reliance on the representations.

<u>Class Allegations</u>

99.    The classes will consist of all purchasers of the Products in New York, the other 49 states and a nationwide class, during the applicable statutes of limitations.

100.    Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

101.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

102.    Plaintiff is an adequate representative because her interests do not conflict with other members.

103.    No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

104.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

105.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

106.    Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York GBL §§ 349 & 350</u>
<u>(Consumer Protection from Deceptive Acts)</u>

107.    Plaintiff incorporates by reference all preceding paragraphs.

108.    Plaintiff and class members desired to purchase, consume and use products or

services which were as described and marketed by defendant and expected by reasonable consumers, given the product or service type.

109.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

110.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

111.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

112.  Plaintiff  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

113.  Plaintiff incorporates by reference all preceding paragraphs.

114.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

115.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

116.  Defendant had a duty to disclose and/or provide non-deceptive marketing of the

19

Products and knew or should have known same were false or misleading.

117.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

118.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

119.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

120.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

121.  Plaintiff incorporates by reference all preceding paragraphs.

122.  The Products were manufactured, labeled and sold by defendant and warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

123.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

124.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

125.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

126.  Defendant received notice and should have been aware of these misrepresentations

due to numerous complaints by consumers to its main office over the past several years.

127.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

128.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

129.  Plaintiff incorporates by references all preceding paragraphs.

130.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

131.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Products on the front label when it knew this was not true.

132.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

133.  Plaintiff incorporates by reference all preceding paragraphs.

134.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   February 23, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500

Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-00979
United States District Court
Eastern District of New York

Janet Kyszenia, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

The Hain Celestial Group, Inc.,

Defendant

## Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
    Tel: (516) 303-0552
    Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  February 23, 2020

/s/ Spencer Sheehan
Spencer Sheehan